OPINION OF THE COURT
Analisa Torres, J.
Defendant, Luis Davila, Jr., is charged with criminal possession of a weapon in the second, third and fourth degrees (Penal Law § 265.03 [3]; § 265.02 [1]; § 265.01 [1]).
Defendant moves to suppress a firearm and statements, on the ground that they are the fruits of an unlawful stop and arrest.
I conducted a Mapp/Huntley/Dunaway hearing over five days, commencing on December 2, 2009 and ending on January 11, 2010. The motion was marked submitted on February 26, 2010, when the People served their memorandum of law.
At the hearing, the prosecution called the following witnesses: Police Officer Jesse Turner, Detective Sean O’Connell, Todd Child, Director of Development at ELSAG North America, LLC, Michelle L. Scott, Operations Supervisor at the Department of Motor Vehicles, and Lawrence Hinrichs, an auto crimes investigator in the Bronx District Attorney’s Office. I credit their testimony.
Following are my findings of fact and conclusions of law.
Facts
This case involves the Mobile Plate Hunter, an image-processing technology system developed by the ELSAG company and used by the New York City Police Department (NYPD) to identify vehicles by their license plates. Cameras mounted on top of patrol cars automatically photograph license plates at the rate of hundreds per minute. The images are converted into letters and numbers and sent to a computer located in the trunk of the police vehicle. The computer compares the information to a database containing a list of license plates corresponding to cars that have been reported stolen, where registration or insurance coverage has lapsed, or other similar violations of law. These lists are known in law enforcement as “hot lists.” If a license plate read by the camera matches one in the database, *923 an alarm sounds on the laptop computer mounted between the driver and passenger seats, alerting the officer to the nature of the crime or violation associated with the plate.
In New York State, the plate reader hot list database is updated every morning. In December 2008, a police vehicle equipped with a plate reader would obtain the update wirelessly, by driving to a designated download site — the Fort Totten base in Queens. In addition to the plate reader database, the laptop computer in NYPD vehicles provides access to the New York State Police Information Network (NYSPIN), another hot list database that is even more current than the plate reader’s.
In 2007, the NYPD issued departmental guidelines for the “use, maintenance and accountability,” of plate readers (NYPD operations order No. 33). The guidelines set forth a two-step process to ensure the reliability of plate reader information. First, before operating the device, officers are required to update the plate reader’s database by downloading the hot list issued within the last 24 hours. (Id. at 2.) Second, if the plate reader alarm sounds, before “initiating any law enforcement action,” an officer must consult the NYSPIN database to check whether the plate reader information is accurate. (Id.) Todd Child, a computer science expert employed by ELSAG, the company that created the license plate recognition technology, also recommends that officers check the plate reader alert against the NYSPIN database.
Police Officer Jesse Turner, a 4V2-year veteran of the NYPD, has participated in over 400 arrests and has personally made 130 arrests, two of which involved firearms. At the police academy, Turner received training in the use of firearms and the manner in which they are concealed.
On December 4, 2008, at approximately 10:00 p.m., Turner and his partner, Sergeant John White, were riding in a marked police car equipped with a license plate reader, patrolling the area of Fteley and Story Avenues in the Bronx. Before beginning the patrol, Turner had not verified whether the plate reader hot list had been downloaded within the last 24 hours. In fact, the database was updated approximately 36 hours earlier, at 9:45 a.m. on December 3, 2008.
The officers were traveling northbound on Story Avenue, when a four-door BMW passed them in the southbound lane. The plate reader sounded, indicating on the laptop screen that the car’s registration was suspended. The vehicle was registered to Angelica Genao. Neither Turner nor White checked the plate *924 reader information against the NYSPIN database accessible on the patrol car’s laptop computer.
Turner made a U-turn, followed the BMW for a couple of blocks and conducted a stop. The officers exited their car with their guns bolstered. Turner approached the driver side of the vehicle while White walked toward the passenger side. Angelica Genao, the driver, rolled down her window. Defendant, seated in the front passenger seat and wearing a hoodie sweatshirt, was “looking down towards his feet” and “actually, furtively, with his hands pushing something down his waistband.” Turner believed defendant’s behavior was “suspicious” and Turner feared for his and his partner’s safety. Two men occupied the back seat.
Turner asked Genao to exit and escorted her to the rear of the BMW Turner asked, “is there anything in the vehicle or any weapons that could hurt me or my partner?” She answered, “[N]ot that I know of, I don’t think so.”
Turner looked toward White and asked him to have defendant exit the car. Defendant stepped out of the BMW “hunched over.” With his “rear side fac[ing] the sergeant,” defendant “spun counterclockwise toward [Turner]” and walked over to Turner. Turner saw a “crease line bulge towards his right groin area in the upper thigh,” four to six inches below where the hoodie fell. The object appeared to be 372 inches thick, which, Turner believed, based on his training and knowledge, was larger than a cell phone.
Turner grabbed the bulge and asked defendant whether “there [is] anything [he] should know about.” Defendant leaned over and whispered into the officer’s ear, “a piece,” “a gun.” Turner shifted his hand toward defendant’s waistband and felt a handle of a firearm. Turner then raised defendant’s sweatshirt and saw half an inch of the handle protruding from the waistband. Turner pulled out the weapon and called out, “John,” signaling to his partner that there was an emergency. White drew his gun, took defendant’s firearm and bolstered it.
White requested backup assistance. When the additional officers arrived, Genao was frisked and the backseat passengers were led out of the vehicle. All four occupants were placed under arrest and transported to the 43rd Precinct.
At the station house, Turner conducted a NYSPIN database check of the BMW license plate. NYSPIN confirmed the registration suspension and Turner issued a summons to Genao.
*925 Defendant was placed in a single holding cell. Twenty minutes after the arrest, in Turner’s presence, defendant was interviewed by another officer. After defendant was read the Miranda warnings, he agreed to speak to the police. During the six-minute interview, defendant explained that the gun belonged to Luis Peña with whom he had gotten into a fight that day and, while defending himself, defendant seized the weapon from Peña.
Defendant was taken to an interview room. At 12:03 a.m., Detective O’Connell, a 12-year veteran of the NYPD, conducted a second interview. O’Connell asked defendant basic pedigree questions and defendant began to explain how he came to possess the firearm. O’Connell stopped defendant from speaking further and advised him of his Miranda rights using a form, which defendant signed. Defendant agreed to talk with O’Connell and recounted his story.
Defendant gave a three-page written statement, describing his long-standing feud with Peña. That day, Peña had tried to use the gun against defendant but defendant wrested it away and fled the scene by car with his girlfriend and brothers. The other occupants were unaware that defendant had a firearm. Defendant explained that he was afraid to surrender the gun to the police, because Peña had previously threatened to hurt defendant and his family. Before defendant could decide what to do with the weapon, Turner had stopped the BMW
Turner, O’Connell or another officer was either present in the room or observing defendant during the two hours defendant took to write the statement. The interview ended at 2:10 a.m.
Law
Driving a car with a suspended registration is a misdemeanor. (Vehicle and Traffic Law § 512.) Information from a police computer indicating that a vehicle’s registration has been suspended provides a proper basis for a traffic stop. (People v Diggs, 38 AD3d 565 [2d Dept 2007].)
Because of the inordinate risk inherent in approaching a person seated inside an automobile, officers may order both the driver and passenger to exit the vehicle without a particularized reason for believing that the occupants possess a weapon. (People v Alvarez, 308 AD2d 184, 187 [1st Dept 2003].)
When an occupant of a car makes physical movements that suggest that he is concealing a weapon, such conduct gives rise to reasonable suspicion justifying a patdown. (People v Crespo, *926 292 AD2d 177 [1st Dept 2002] [suspicious behavior consisted of “adjusting . . . jacket away from (the) body while looking at the officer”].) The presence of a bulge resembling a weapon in an occupant’s clothing is also a lawful basis for a frisk. (People v Williams, 287 AD2d 396 [1st Dept 2001]; People v Duncan, 234 AD2d 8, 9 [1st Dept 1996].)
During a frisk, an officer may make an investigatory inquiry without administering Miranda warnings, when the purpose of such questioning is not to elicit incriminating statements but to ensure the officer’s safety. (People v Jenkins, 208 AD2d 459, 460 [1st Dept 1994].) After the arrest, a police officer must administer the Miranda warnings prior to interrogating defendant. CMiranda v Arizona, 384 US 436 [1966].) Officers need not recite the exact language set forth in Miranda v Arizona, so long as the substance of the warning adequately apprises defendant of the requisite information. (People v Evans, 162 AD2d 702 [2d Dept 1990].) A defendant’s post Miranda statements are admissible, if the totality of the circumstances surrounding defendant’s confession show that defendant voluntarily and intelligently waived those rights. (People v Petronio, 34 AD3d 602, 604 [2d Dept 2006].)
Discussion
Officer Turner’s stop of the BMW, after the plate reader indicated that the vehicle’s registration was suspended, was lawful. I reject defendant’s contention that the officer’s failure to adhere to the two-step protocol set forth in the NYPD guidelines — to first verify whether the plate reader had been updated within the last 24 hours and, before taking action, to check the accuracy of the plate reader information against the NYSPIN database on the patrol car’s laptop — invalidates the stop. Although the NYPD guidelines may reflect ideal practices, they constitute recommendations, not law. Turner reasonably relied on the plate reader hot list. (See People v Boomer, 187 AD2d 659 [2d Dept 1992] [police reasonably relied on computer check indicating that defendant’s vehicle was stolen, even though a later Department of Motor Vehicles check failed to confirm that the car had been stolen].) Moreover, the plate reader database was hardly “stale,” as defendant suggests; the hot list had been updated a mere 36 hours before the stop and accurately reported the status of Genao’s vehicle.
The officers properly asked Genao and defendant to exit the BMW. In addition, defendant’s physical movements — his looking *927 down at his feet and furtively pushing something down his waistband while seated in the vehicle, defendant’s hunching over as he exited the vehicle with his back to Sergeant White— coupled with the presence of a bulge protruding from his groin and upper thigh area, gave rise to reasonable suspicion warranting a frisk. Moreover, Genao’s equivocal response to Turner’s inquiry about whether the vehicle contained something that could endanger the officers provided further justification for the frisk.
Defendant’s statement that he possessed a gun, elicited while he was being frisked, was voluntary and not the product of custodial interrogation. Turner’s recovery of a gun from defendant’s person gave rise to probable cause for defendant’s arrest.
Defendant’s postarrest oral and written statements were voluntary and given after he waived his Miranda rights. There is no evidence suggesting that the statements were involuntarily made as such term is defined in the case law and GPL 60.45. Defendant’s self-serving statements only lend support to their voluntariness.
I have considered defendant’s remaining arguments and find them without merit.
Conclusion
Accordingly, defendant’s motion is denied.